# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

LILA MARIE RIZK,
        *Defendant-Appellant.*

No. 10-50051

D.C. No.
2:07-cr-00755-
DDP-3

OPINION

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted
August 31, 2011—Pasadena, California

Filed October 19, 2011

Before: Mary M. Schroeder and Ronald M. Gould,
Circuit Judges, and Michael Patrick McCuskey,
Chief District Judge.*

Opinion by Judge Gould

---

*The Honorable Michael Patrick McCuskey, Chief District Judge for
the U.S. District Court for Central Illinois, Urbana, sitting by designation.

19185

**COUNSEL**

Michael N. Friedman, United Defense Group, LLP, Studio City, California, for the defendant-appellant.

Jeremy D. Matz, Michael J. Raphael, and Monica E. Tait, United States Attorney's Office, Los Angeles, California, for the plaintiff-appellee.

**OPINION**

GOULD, Circuit Judge:

Lila Rizk appeals her jury conviction for one count of conspiracy in violation of 18 U.S.C. § 371; one count of bank fraud in violation of 18 U.S.C. § 1344(1); and thirteen counts of loan fraud in violation of 18 U.S.C. § 1014. Rizk contends that the district court committed prejudicial error by admitting two summary charts under Federal Rule of Evidence 1006. Rizk also contends that there was insufficient evidence to support each of her convictions. Rizk further contends that the district court erred in ordering her to pay restitution in the full amount of the victim lenders' loss, despite a prior civil settlement with the victim lenders that included a release from lia-

bility. We have jurisdiction under 18 U.S.C. § 1291, and we affirm.

# I

## A

Lila Rizk was a licensed real estate appraiser based in Orange County, California. She did business with Mark Abrams, a mortgage broker, and his business partner Charles Elliott Fitzgerald, a real estate developer. Between July 2000 and January 2003, Abrams, Fitzgerald, and others associated with them initiated and carried out a scheme to defraud mortgage lenders. Abrams and Fitzgerald purchased homes in exclusive California communities at or near their true market values. In the purchase contracts they required sellers and their agents to keep the purchase prices confidential. Abrams and Fitzgerald then applied for loans in amounts far greater than the actual purchase prices. To deceive mortgage lenders into believing the loans were adequately secured by the properties, Abrams, Fitzgerald, and their associates made phony purchase contracts and gained inflated appraisal reports for the homes. Relying on this false documentation, mortgage lenders funded and bought loans in amounts exceeding the homes' actual purchase prices and market values. As a result, Abrams and Fitzgerald made, while the defrauded victim lenders lost, millions of dollars. Losses to these lenders in total exceeded $40 million.

Rizk actively participated in the mortgage fraud scheme. The lenders required appraisals before they would approve home loans. The appraisals generated by Rizk made the homes appear to be worth much more than their true values. The lenders relied on Rizk's inflated appraisals in funding and buying the loans. In providing the inflated appraisals, Rizk followed an array of improper and risk-enhancing practices. Rizk improperly ignored the original sellers' list prices, often hundreds of thousands or millions of dollars less than her

appraisals. Rizk did not use genuinely comparable properties. Rizk used as "comparable" properties homes that were distant from, differed from, or had sold long before the homes being appraised. Rizk also used homes, for which she had previously given inflated appraisals, as "comparable" properties. Both from the improper acts that she did in fashioning appraisals, and from her failure to use appropriate practices in determining market values of comparable properties, there was abundant evidence that Rizk did not exercise an independent professional judgment in making her appraisals for Abrams and Fitzgerald.

## B

Before trial, the government moved in limine to introduce charts summarizing the properties involved in the scheme. The charts listed 96 properties in chronological order of the corresponding loan transactions. The first chart showed the following data for each property: 1) the actual escrow closing date and the date reported to the lender; 2) the actual sale price and the price reported to the lender; 3) the amount of the loan funded; 4) whether the real estate agents who participated in the scheme received a commission; 5) if so, how much; 6) the named appraisers on the appraisals submitted to the lender; and 7) whether Rizk provided records about the transaction to the government under subpoena.

The second chart showed the following data for each property: 1) the appraisal date; 2) the appraisal value submitted to the lender; 3) the named appraisers on the appraisals submitted to the lender; and 4) the addresses of comparable properties used in the appraisal. This chart used color-coding to show how Rizk used properties she had previously appraised at inflated values as comparables in later appraisals.

The district court granted the government's motion, concluding over objection that the charts were admissible under Federal Rule of Evidence 1006. Rizk and her co-defendants

had argued that the charts were overbroad, including properties not specifically named in the indictment.[1] The district court, however, accepted that the purpose of the charts was to show the full scope of the fraudulent scheme and that the indictment "expressly include[d] more than the nine listed properties." And so the district court held that the summary evidence was within the scope of the indictment. The district court also stated that Rizk and her co-defendants had been given the underlying documents showing what was described in the summary charts, and that they had ample time to review them before trial.

Rizk was a named appraiser in only 39 of the 96 transactions shown on the charts. But at trial the government presented evidence showing that Rizk had prepared the appraisals for all 96 transactions. The summary charts showed that Rizk had produced records to the government regarding transactions in which she was not a named appraiser. These records included sketches, notes, emails, and at least one appraisal matching a submitted appraisal. The government introduced testimony that later in the scheme, Rizk's co-conspirators removed her name from the appraisals and substituted the names of unwitting appraisers not connected to the scheme. Her co-conspirators testified that Rizk knew and was relieved that her name was no longer being used on the appraisals. And the government showed that Rizk continued to receive compensation from Abrams and Fitzgerald long after the submitted appraisals stopped bearing her name.

At trial, Rizk admitted that her appraisals were too high, but argued that she made them in good faith and that she lacked knowledge of the conspiracy. Rizk argued that Abrams exploited her because she was based in Orange County and

---

[1]The overt acts and substantive counts of the indictment identified only nine specific properties. But the indictment alleged that the defendants committed the enumerated overt acts, "among others," in furtherance of the conspiracy.

"didn't know" Los Angeles, Beverly Hills, or Bel Air, which housed the subject properties she appraised. She said that the only sale price she was given for a property was the falsified, inflated sale price (not the true sale price kept confidential) and that she used the price she was given as her starting point. She said that Abrams gave her the deficient comparable properties and misrepresented them to her, that she believed Abrams was credible, and that she did not know she was using bad comparables. Rizk also contested the government's proffer that she had performed the appraisals in all 96 transactions listed on the summary charts. She claimed that for some properties, Abrams, Fitzgerald, and their associates had produced the appraisals and forged her name. In short, Rizk's defense was that despite her failure to perform the due diligence required of her in making the appraisals, she did not knowingly participate in the scheme, and lacked the required intent to support a conviction for conspiracy, bank fraud, and loan fraud.

From the evidence presented to it, the jury might have viewed Rizk as a key and knowing participant in a deliberate fraud, or as an innocent and unknowing dupe used and manipulated by the ringleaders of the fraud. However, the jury did not believe Rizk's account. It found her guilty on all counts.

Rizk then filed a motion for acquittal, which the district court denied. The district court sentenced Rizk to a three-year prison term, to be followed by a three-year term of supervised release, and it ordered forfeiture and restitution. Pursuant to the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A *et seq.*, the district court ordered restitution in the total amount of the victims' loss, $46,515,846. This restitution order did not account for a prior civil settlement between Rizk and the victim lenders, in which the victim lenders agreed to release all claims against Rizk in consideration of her payment of $967,083.68, which was the limit of her errors and omissions insurance policy. The district court entered judgment and Rizk timely appealed.

We address in turn Rizk's contentions on appeal.

## II

Rizk challenges the admission of the charts summarizing the real estate transactions involved in the fraud scheme. First, she contends that the charts let the government put facts before the jury without presenting evidence of those facts. Second, she complains that because the charts cover transactions not specifically referenced in the indictment, they were "other acts" evidence under Federal Rule of Evidence 404(b). Third, she asserts that because the "other acts" evidence admitted under Rule 404(b) in the charts was unfairly prejudicial, this evidence should have been excluded under Federal Rule of Evidence 403.

## A

We review a district court's decision to admit evidence for abuse of discretion. *Boyd v. City & Cnty. of S.F.*, 576 F.3d 938, 943 (9th Cir. 2009).

**[1]** Before addressing the particular challenges that Rizk makes to the admission of the summary charts under Federal Rule of Evidence 1006, it is helpful to set forth a clear and concise statement of the rule and its underlying reason. Rule 1006 provides: "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." "The purpose of the rule is to allow the use of summaries when the documents are unmanageable or when the summaries would be useful to the judge and jury." *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1516 (9th Cir. 1985), *superseded by statute*, 28 U.S.C. § 1961, *as recognized in Northrop Corp. v. Triad Int'l Mktg. S.A.*, 842 F.2d 1154, 1156 (9th Cir. 1988).

**[2]** A proponent of summary evidence must establish that the underlying materials upon which the summary is based (1)

are admissible in evidence and (2) were made available to the opposing party for inspection. *Amarel v. Connell*, 102 F.3d 1494, 1516 (9th Cir. 1996). These materials must be admissible, but need not themselves be admitted into evidence. *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988). The availability requirement ensures that the opposing party has "an opportunity to verify the reliability and accuracy of the summary prior to trial." *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261 (9th Cir. 1984).

**[3]** Here, the district court did not abuse its discretion in admitting the government's summary charts under Rule 1006. The underlying materials for the charts were standard real estate records that were both admissible in evidence and made available to Rizk for inspection. Rizk does not argue that the government did not establish the two requirements for admissibility. Rather, she argues that the government did not present evidence supporting the information in the charts, i.e., that it did not introduce the underlying records at trial.[2] But Rizk's contention is without merit because Rule 1006 allows precisely what Rizk labels prejudicial error. Rule 1006 permits admission of summaries based on voluminous records that cannot readily be presented in evidence to a jury and comprehended. It is essential that the underlying records from which the summaries are made be admissible in evidence, and available to the opposing party for inspection, but the underlying evidence does not itself have to be admitted in evidence and presented to the jury.

---

[2]Rizk complains that the government did not establish, among other things, the fair market value of each property listed on the charts. But this contention—about what the charts did not include—goes to their weight rather than their admissibility. *See United States v. Scholl*, 166 F.3d 964, 978 (9th Cir. 1999) ("'Generally, objections that an exhibit may contain inaccuracies, ambiguities, or omissions go to the weight and not the admissibility of the evidence.'" (quoting *United States v. Keplinger*, 776 F.2d 678, 694 (7th Cir. 1985))).

**B**

We review de novo whether a summary chart falls within the scope of Rule 404(b). *United States v. Soliman*, 813 F.2d 277, 278 (9th Cir. 1987).**³**

**[4]** Rule 404(b) provides that evidence of "other crimes, wrongs, or acts" is inadmissible to prove character or criminal propensity but is admissible for other purposes, such as proof of intent, plan, or knowledge. Fed. R. Evid. 404(b). "This rule is inapplicable, however, where the evidence the government seeks to introduce is directly related to, or inextricably intertwined with, the crime charged in the indictment." *United States v. Lillard*, 354 F.3d 850, 854 (9th Cir. 2003). Summary evidence admitted under Rule 1006 may thus be outside Rule 404(b)'s scope. For example, in *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir.2004), we held that each action listed in the government's summary exhibit "was 'inextricably intertwined' with the conspiracy, and therefore not subject to Rule 404(b), because each occurred within the temporal scope of the conspiracy and comprised the conspiracy." *See also Soliman*, 813 F.2d at 279 (finding that summary chart was not "other crimes" evidence). *Cf. United States v. Robinson*, 774 F.2d 261, 264, 276 (8th Cir. 1985) ("The summary properly included all 105 applicants [rather than the 15 named in the indictment], because information regarding all of these individuals was relevant in delineating the enormous scope of the [loan fraud] scheme.").

**[5]** The rule is well established that the government in a conspiracy case may submit proof on the full scope of the

---

**³**In opposition to the government's motion in limine, Rizk and her co-defendants argued that the summary charts were overbroad because they included properties not specifically named in the indictment. Because Rizk's 404(b) argument on appeal is similar in substance to the defendants' argument below, we treat her 404(b) argument as one raised before the district court.

conspiracy; it is not limited in its proof to the overt acts alleged in the indictment. This is consistent with our own prior precedent and that of other circuits. *See, e.g.*, *Montgomery*, 384 F.3d at 1061-62; *Lillard*, 354 F.3d at 854; *United States v. Williams*, 989 F.2d 1061, 1070 (9th Cir. 1993) (finding no abuse of discretion where district court admitted evidence of "uncharged transactions" that were "closely linked to" events charged in drug conspiracy); *United States v. Bonanno*, 467 F.2d 14, 17 (9th Cir. 1972) ("One of the charges in the indictment alleged conspiracy. In conspiracy prosecutions, the Government has considerable leeway in offering evidence of other offenses [not charged in the indictment]."); *United States v. Janati*, 374 F.3d 263, 270 (4th Cir. 2004) ("It is well established that when seeking to prove a conspiracy, the government is permitted to present evidence of acts committed in furtherance of the conspiracy even though they are not all specifically described in the indictment."); *United States v. Powers*, 168 F.3d 741, 749 (5th Cir. 1999) ("[W]here a conspiracy is charged, acts that are not alleged in the indictment may be admissible as part of the Government's proof."); *United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) ("When the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself. It is clear the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy." (internal citations and quotation marks omitted)); *United States v. Lewis*, 759 F.2d 1316, 1344 (8th Cir. 1985) ("[I]n conspiracy cases, the government is not limited in its proof to establishing the overt acts specified in the indictment."); *see also United States v. Gold*, 743 F.2d 800, 813 (11th Cir. 1984) (distinguishing evidence of "facts different from those alleged in the indictment" from "facts which, although not specifically mentioned in [the overt acts section of] the indictment, are entirely consistent with its allegations").

**[6]** The district court did not abuse its discretion in concluding that the government's summary charts were within

the scope of the indictment. The real estate transactions shown on the charts were "inextricably intertwined" with the conspiracy charge and were not "other acts" subject to Rule 404(b). *See Lillard*, 354 F.3d at 854. Rizk challenges the charts' admission because they included transactions not specified in the indictment and appraisals not bearing her name. But the indictment alleges a conspiracy. The government offered the summary charts to show the full scope of that conspiracy and as proof that the non-specified transactions were not "other acts" at all—that is, that Rizk had prepared the appraisals for all 96 transactions in furtherance of the conspiracy.

## C

**[7]** The district court has broad discretion to admit potentially prejudicial evidence under Rule 403, which provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *Boyd*, 576 F.3d at 948. We generally review the application of Rule 403 for abuse of discretion. *Id.* But where a party did not object to the district court's admission on Rule 403 grounds, we review for plain error. *United States v. Plunk*, 153 F.3d 1011, 1019 n.7 (9th Cir. 1998), *overruled on other grounds by United States v. Hankey*, 203 F.3d 1160, 1169 n.7 (9th Cir. 2000). The review for plain error is even more deferential than review for abuse of discretion. "Under plain-error review, reversal is permitted only when there is (1) error that is (2) plain, (3) affects substantial rights, and (4) 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.' " *United States v. Cruz*, 554 F.3d 840, 845 (9th Cir. 2009) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)). "[I]n view of the inherently fact-specific nature of the Rule 403 balancing inquiry, and the special deference to which district courts' decisions to admit evidence pursuant to that Rule are entitled, it is the rare exception when a district court's decision to admit evidence under Rule 403 constitutes

plain error." *Plunk*, 153 F.3d at 1019 n.7 (internal citations omitted).

The making of rulings on disputed points of evidence is the bread and butter of trial. It comes up every day in a trial, it represents a mainstay part of the controversy, and a district court must generally make rulings quickly and on the spot to keep the proceedings fair and to move them toward completion. Also, the district court has discretion in some cases properly to admit evidence subject to a limiting instruction given the jury to avoid or lessen any undue prejudice. For such reasons, it is very important that a party objecting to evidence being admitted give the court the grounds of objection. Because Rizk did not make a Rule 403 objection before the district court, we review this challenge to introduction of the summary charts only for plain error.

Rizk contends on appeal that the district court insufficiently weighed the prejudicial effect of the summary charts. She argues that the charts' comparison of true and inflated sales prices for the 96 homes was unfairly prejudicial because it permitted the inference that for each home the appraisal was fraudulent and Rizk had prepared it, though she was the named appraiser in less than half of the transactions.

**[8]** To the extent that Rizk's Rule 403 argument is predicated on her contention that the summary charts were "other acts" evidence subject to Rule 404(b), we reject it. Rizk relies on *Huddleston v. United States*, 485 U.S. 681, 688 (1988), in which the Supreme Court addressed the potential prejudicial effect of Rule 404(b) evidence in relation to Rule 403. But here, because we hold that the charts were not subject to Rule 404(b), there was no danger that the jury would misuse the so-called "uncharged other acts" to conclude that Rizk had a criminal propensity to inflate appraisals generally. The key danger to Rizk was that the jury would believe the government's proof that Rizk had in fact inflated the appraisals in

the 96 listed transactions. There was no Rule 404(b) problem, and so her *Huddleston* argument is unavailing.

**[9]** Even if we view Rizk's Rule 403 argument as independent of her Rule 404(b) contention, we are not persuaded that she has shown grounds for relief. We have previously rejected Rule 403 challenges to the admission of summary evidence that was relevant and not unfairly prejudicial. *See, e.g.*, *Montgomery*, 384 F.3d at 1062 (explaining that summary exhibit was relevant because it outlined scope of conspiracy and was not unfairly prejudicial because limiting instruction was given and "defendants had notice of the exhibit and an opportunity to cross-examine"). The same rule and practice has been followed in other circuits. *See, e.g., United States v. Boesen*, 541 F.3d 838, 848-49 (8th Cir. 2008) (holding that defendant suffered no unfair prejudice because charts represented accurate summaries, "and evidence is not unfairly prejudicial merely because it tends to prove a defendant's guilt"); *United States v. Seeling*, 622 F.2d 207, 214 (6th Cir. 1980) (rejecting argument that summaries more prejudicial than probative because summaries showed 1,409 sales but only 32 mentioned in indictment).

**[10]** Applying these principles, we conclude that a jury rationally could view the summary charts as proof of the scope of the conspiracy and of Rizk's broad participation in it.[4] Because the charts supported the government's theory that Rizk prepared the appraisals in all 96 transactions, the charts may have had impact tending to show Rizk's guilt, but they

---

[4]In her Reply Brief, Rizk frames her objection that the charts exceeded the indictment's scope as a relevance challenge based on Federal Rule of Evidence 401. Rizk has waived this argument because she develops it for the first time in her Reply Brief and because she did not give Rule 401 as a ground of objection before the district court. *See Jachetta v. United States*, ___ F.3d ___, No. 10-35175, 2011 WL 3250450, at *11 (9th Cir. Aug. 1, 2011). In any case, in light of our conclusion above, her argument is unpersuasive. The 96 transactions listed on the charts were relevant to the scope of the conspiracy and Rizk's broad participation in it.

were not unfairly prejudicial. *See Seeling*, 622 F.2d at 214. Rizk had an opportunity to inspect the documents underlying the charts, to cross-examine the government witnesses who prepared them, and to argue to the jury that Rizk did not prepare inflated appraisals in all 96 transactions. *See Montgomery*, 384 F.3d at 1062. Because the charts' probative value was not substantially outweighed by the danger of unfair prejudice, the district court did not err, let alone plainly err, in admitting them.

## III

Rizk argues that the evidence at trial was insufficient to sustain her convictions because the government did not establish that she had knowledge of the objective of the conspiracy and that she had the requisite intent to commit bank fraud and loan fraud. After trial, Rizk moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(c), and the district court denied her motion.

We review de novo the denial of Rizk's Rule 29 motion and her challenge to the sufficiency of the evidence; the standard to be applied is the same. *United States v. Gonzalez-Diaz*, 630 F.3d 1239, 1242 (9th Cir. 2011); *United States v. Bennett*, 621 F.3d 1131, 1135 (9th Cir. 2010). The standard of review is not favorable to Rizk's appellate claim. We do not retry the evidence afresh. Instead, with a sufficiency of evidence challenge, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This leads us to consider the elements of the crimes for which Rizk was convicted, and how a rational jury could view the evidence presented thereon.

## A

**[11]** "To prove a conspiracy under 18 U.S.C. § 371, the government must establish: (1) an agreement to engage in

criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime." *United States v. Sullivan*, 522 F.3d 967, 976 (9th Cir. 2008). "Knowledge of the objective of the conspiracy is an essential element." *United States v. Krasovich*, 819 F.2d 253, 255 (9th Cir. 1987). "However, the government need not prove knowledge with direct evidence; circumstantial evidence and the inferences drawn from that evidence can sustain a conspiracy conviction." *United States v. Wright*, 215 F.3d 1020, 1028 (9th Cir. 2000).

**[12]** Rizk contends that the evidence was insufficient to establish that she knew of the objective of the conspiracy. We disagree. Rizk selectively identifies evidence from the record tending to show her unwitting participation in the scheme. For example, she points to testimony that her co-conspirators kept certain information from her related to the fraud. But the government did not have to present direct evidence that Rizk knew every detail about the conspiracy. *See Wright*, 215 F.3d at 1028. The government needed only to present sufficient evidence from which any rational jury could infer that Rizk knew the conspiracy's objective. *See id.*

**[13]** The jury heard testimony that Rizk knew her appraisals were used to gain loans on properties. Abrams testified to Rizk's requests that actual list prices be removed from the Multiple Listing Service database, and that properties be re-listed on the database at higher prices, before she issued her inflated appraisals. Evidence at trial showed that Rizk appraised homes at or near values the scheme's leaders asked for, and that her appraisal values far exceeded homes' true market values, often by two to three hundred percent. Finally, the government presented evidence that Rizk prepared appraisals to be signed in the name of her co-defendant Scott Robinson and that later in the scheme, Rizk knew and was relieved that other appraisers' names were being fraudulently substituted in place of her own. From this evidence, viewed in the light most favorable to the government, a rational jury

could have determined beyond a reasonable doubt that Rizk had knowledge of the objective of the conspiracy.

**B**

The essential elements of bank fraud under 18 U.S.C. § 1344(1) are: "(1) that the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) that the defendant did so with the intent to defraud; and (3) that the financial institution was insured by the FDIC [Federal Deposit Insurance Corporation]." *United States v. Warshak*, 631 F.3d 266, 312 (6th Cir. 2010). Intent to defraud may be established by circumstantial evidence. *Sullivan*, 522 F.3d at 974 (holding, in mail and wire fraud case, that "the scheme itself may be probative circumstantial evidence of an intent to defraud").

**[14]** Rizk argues that the government had to prove an additional element, intent to expose a lender to a risk of loss. She contends that there was insufficient evidence to sustain her conviction for bank fraud because the government did not do so. This circuit "has never adopted a 'risk of loss' analysis in bank fraud cases." *United States v. Wolfswinkel*, 44 F.3d 782, 786 (9th Cir. 1995). Here, as in *Wolfswinkel*, we need not decide whether risk of loss is an essential element of bank fraud because "the government offered sufficient evidence at trial to prove that the conduct for which [Rizk] was convicted exposed at least one bank to a risk of loss." *Id.* Rizk was an experienced appraiser. Rizk knew that her appraisals were being used to finance the purchase of properties. In making her appraisals, Rizk was unduly influenced by the values put forth by Abrams and Fitzgerald. Rizk did not gain truly comparable properties to make her appraisals but instead looked at properties different in nature or location or time of sale, and eventually at her own previously inflated appraisals. An independent skilled or expert view on market values of the subject properties was missing in action. The lenders, to their detriment, relied on her appraisals. The victim lenders' losses from

the fraud totaled more than $46 million. Rizk had an exculpatory explanation, that she was duped and used by the fraud's ringleaders. But a jury did not have to accept this view. We conclude that a rational jury could have found beyond a reasonable doubt that Rizk intended to defraud the lenders and to expose them to a risk of loss.

## C

To convict a defendant of loan fraud under 18 U.S.C. § 1014, the government must prove that he or she "knowingly ma[de] any false statement or report, or willfully overvalue[d] any land, property or security" regarding a loan, to an FDIC-insured bank, for the purpose of influencing the bank's actions. 18 U.S.C. § 1014; *see United States v. Wells*, 519 U.S. 482, 490 (1997); *United States v. Tannehill*, 49 F.3d 1049, 1055 (5th Cir. 1995).

*United States v. Tannehill* illustrates how circumstantial evidence can establish intentional overvaluation of property. In that case, the defendant challenged his § 1014 convictions on the ground that there was insufficient evidence that he knew his appraisals were false. *Tannehill*, 49 F.3d at 1055. The court rejected his argument, concluding that "[t]here was ample evidence from which a rational juror could have found that [the defendant] knew that [his] appraisals overvalued the property." *Id.* Evidence cited in support of the court's conclusion included that the appraisals valued the property at 20 to 30 percent higher than its sale price; that other sales in the area were poor; that the appraisal discrepancies were too great to be the product of negligence; and that an experienced appraiser should have detected the discrepancies. *Id.* at 1055-56.

[15] Rizk argues that the government did not establish that she knowingly overvalued the properties or that she knew her appraisals enabled Abrams to fraudulently obtain loans. But here, as in *Tannehill*, there was "ample evidence" to allow a

rational jury to find that Rizk willfully overvalued property. *See* 18 U.S.C. § 1014; 49 F.3d at 1055. She overvalued properties by two to three hundred percent. She used larger homes and homes in more desirable neighborhoods as comparables, and she later used her own previously inflated appraisals to arrive at subsequent inflated values. Rizk's actions are inconsistent with her claim that she made the appraisals in good faith, and as an experienced appraiser, she should have known better. *See Tannehill*, 49 F.3d at 1055-56. In light of our conclusion above that there was sufficient evidence that Rizk knew the conspiracy's objective, her argument that she did not know the intended purpose of her appraisals is unavailing. A rational jury could have determined beyond a reasonable doubt that Rizk knew the intended purpose was to obtain loans in furtherance of the conspiracy, and that she prepared the inflated appraisals for the purpose of influencing the lenders' actions. *See* 18 U.S.C. § 1014.

## IV

Rizk's final challenge is to the district court's restitution order that she pay $46,515,846 to the victim lenders. She argues that the order conflicts with a prior civil settlement before the same district judge. The settlement agreement provided that, in exchange for Rizk's payment of $967,083.68, the policy limit of her errors and omissions insurance policy, the victim lenders would release all claims against Rizk for losses they sustained because of her appraisals. Because Rizk did not raise this issue before the district court, we review again for plain error. *United States v. Van Alstyne*, 584 F.3d 803, 819 (9th Cir. 2009).

**[16]** The Mandatory Victim Restitution Act ("MVRA") requires a district court, in sentencing a defendant convicted of certain offenses, including an offense against property committed by fraud, *see* 18 U.S.C. § 3663A(c)(1)(A)(ii), to order restitution to each victim "in the full amount of each victim's losses." *Id.* § 3664(f)(1)(A); *see id.* § 3663A(a)(1);

*United States v. Edwards*, 595 F.3d 1004, 1012-13 (9th Cir. 2010). The MVRA applies even where the victims have received compensation from another source: "In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution." 18 U.S.C. § 3664(f)(1)(B). If a victim receives compensation for a loss from insurance or any other source, the MVRA requires the district court to order restitution to "the person who provided or is obligated to provide compensation," but only after all victims have been fully compensated for their losses. *Id.* § 3664(j)(1). Finally, the amount of restitution is offset by "any amount later recovered as compensatory damages for the same loss by the victim" in civil proceedings. *Id.* § 3664(j)(2); *Edwards*, 595 F.3d at 1013.

**[17]** In *United States v. Edwards*, we rejected a defendant's contention that a prior bankruptcy settlement precluded a later criminal restitution order. 595 F.3d at 1013. Our holding in *Edwards* applies to prior civil settlements, because there we affirmed the continued viability of *United States v. Cloud*, 872 F.2d 846 (9th Cir. 1989). In *Cloud*, a defendant convicted of bank fraud had entered into a prior settlement agreement with the defrauded bank, and the bank had entered into a settlement agreement with its insurer. 872 F.2d at 853. In the agreements, the victims had agreed to release all claims against the defendant. *Id.* We concluded that neither the bank nor the insurer could waive, through settlement, its "right" to restitution under the Victim and Witness Protection Act ("VWPA"), the predecessor statute to the MVRA, because a purpose of criminal restitution is to penalize. *Id.* at 854. In *Edwards*, we concluded that the MVRA does not alter *Cloud* and held that "[c]riminal restitution is mandatory under the MVRA and cannot be waived by a prior civil settlement." 595 F.3d at 1014; *see also United States v. Bearden*, 274 F.3d 1031, 1040-41 (6th Cir. 2001) (collecting cases from other circuits).

**[18]** Rizk's argument that her prior civil settlement precluded the district court's restitution order is foreclosed by our decision in *Edwards*. The MVRA required the district court to order restitution to the victim lenders. We hold that the district court did not err in ordering restitution to be paid to the victim lenders, despite the fact that they had given a release of all claims against Rizk in the prior civil action.

But the district court did err in ordering Rizk to pay $46,515,846 to the victim lenders. Because Rizk's insurer paid the victim lenders $967,083.68 pursuant to the settlement agreement, the district court should have ordered Rizk to pay, first, $45,548,762.32 to the victim lenders, and then, $967,083.68 to Rizk's insurer. *See* 18 U.S.C. § 3664(j)(1).

**[19]** A district court may not order restitution such that victims will receive an amount greater than their actual losses; to do so is plain error. *See United States v. Fu Sheng Kuo*, 620 F.3d 1158, 1163-66 (9th Cir. 2010). In the MVRA, Congress provided that an insurer shall receive restitution for compensating a fraud victim, after the victim is made whole. *See* 18 U.S.C. § 3664(j)(1). Congress also provided that restitution to a victim shall be reduced by any amount the victim later recovers in a civil proceeding. *See id.* § 3664(j)(2). Though the MVRA seeks to fully compensate victims for their losses, *see id.* § 3664(f)(1)(A), these provisions ensure that victims do not through restitution receive an amount exceeding their losses.

**[20]** Under the current restitution order, which is properly before us on this appeal, the victim lenders will receive $967,083.68 more than their actual losses, so imposition of the order in this respect was plain error. We vacate the restitution order and remand with instructions that the district court enter a corrected order. The new restitution order shall reduce the restitution owed to the victim lenders by $967,083.68 and order that amount paid to Rizk's insurer only after the victim lenders have been fully compensated.

**V**

Rizk's convictions are **AFFIRMED** on all counts. The district court's restitution order is **VACATED** and **REMANDED** with instructions.