In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3794

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

BENJAMIN ROBERS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 10 CR 95—**Rudolph T. Randa**, *Judge.*

ARGUED SEPTEMBER 15, 2011—DECIDED SEPTEMBER 14, 2012

Before FLAUM, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* Benjamin Robers pleaded guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 371, based on his role as a straw buyer in a mortgage fraud scheme; Robers signed mortgage documents seeking loans which were based on false and inflated income and assets and based on his claim that he would reside in the houses as his primary residence and pay the mortgages. The loans went into default and the real estate which served as collateral for the loans were later foreclosed upon and resold.

For his role in the scheme, the district court sentenced Robers to three years' probation and ordered him to pay $218,952 in restitution to the victims—a mortgage lender of one property and the mortgage insurance company which had paid a claim on the other defaulted mortgage. Clearly, both mortgage holders experienced significant losses. Robers appeals, challenging only the restitution order.

The Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A "(MVRA"), governs federal criminal restitution. It provides, in the case of a crime "resulting in damage to or loss or destruction of property of a victim," that restitution is mandatory and that a court shall order a defendant to:

> (A) return the property to the owner of the property or someone designated by the owner; or
>
> (B) if return of the property under subparagraph (A) is impossible, impractical, or inadequate, pay an amount equal to the greater of—
>
>> (i) the value of the property on the date of the damage, loss, or destruction, or
>>
>> (ii) the value of the property on the date of sentencing,
>
> less the value (as of the date the property is returned) of any part of the property that is returned.[1]

18 U.S.C. § 3663A(b)(1).

---

[1] For simplicity's sake, we refer to the value of "the property that is returned" as the "offset value."

The dispute in this case concerns the calculation of the "offset value." Robers argues that the MVRA requires the court to determine the offset value based on the fair market value the real estate collateral had on the date the victim lenders obtained title to the houses following foreclosure because that is the "date the property is returned." The government counters that money was the property stolen in the mortgage fraud scheme and that foreclosure of the collateral real estate is not a return of the property stolen; rather, only when the collateral real estate is resold do the victims receive money (proceeds from the sale) which was the type of property stolen. Accordingly, the government argues that the offset value must be determined based on the eventual cash proceeds recouped following the sale of the collateral real estate.

This court in two non-precedential decisions has followed the government's approach. *See infra* at 16-18. The other circuits are split on the issue. The Second, Fifth and Ninth Circuits have held that in a mortgage fraud case, the offset value should be based on the fair market value of the real estate collateral at the time the victims obtain title to the houses. *See infra* at 18-19. Conversely, the Third, Eighth, and Tenth Circuits (and a dissent from the Ninth Circuit) have concluded that it is proper to determine the offset value based on the eventual amount recouped by the victim following sale of the collateral real estate. *See infra* at 19.

Today we join the view of the Third, Eighth, and Tenth Circuits—that the offset value is the eventual cash pro-

ceeds recouped following a foreclosure sale. We reach this decision based on the plain language of the MVRA. The MVRA states that the offset value is "the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1). "The property" for purposes of offset value must mean "the property stolen." The property originally stolen was cash. Some amount of cash is the only way part of the property can be returned. In the mortgage fraud case we have before us, the property stolen is cash—not the real estate which serves as collateral. Accordingly, the property stolen is only returned upon the resale of the collateral real estate and it is at that point that the offset value should be determined by the part of the cash recouped at the foreclosure sale.

We also agree with the government that the victims are entitled to expenses (other than attorney's fees and unspecified fees) related to the foreclosure and sale of the collateral property because those expenses were caused by Robers's fraud and reduced the amount of the property (cash) returned to the victim lenders. Because the district court included attorney's fees and unspecified fees in the restitution award, we vacate that portion of the district court's award, but otherwise affirm, and remand for proceedings consistent with this opinion.

## I. Background

Benjamin Robers was a straw buyer in a mortgage fraud scheme devised by James Lytle and carried out by

Lytle and others. The scheme involved the submission of fraudulent loan applications which materially misrepresented the straw buyers' income, qualifications, and intent to live in the houses and repay the mortgages. The misrepresentations caused loan funds to be wired by lenders to settlement companies which closed the loans. The loans went into default and the banks later foreclosed on and then sold the houses which served as collateral for the loans.

The scheme involved more than fifteen houses in a small geographical area in Walworth County, Wisconsin. Robers served as a straw purchaser for only two houses—one on Grant Street in Lake Geneva and the other on Inlet Shores in Delavan. In the loan applications, which he signed, Robers falsely stated that he would use the houses as his primary residence and that he would pay the notes secured by the mortgages on the houses; he also provided false and inflated information concerning his income and assets. For his role in the scheme, Robers received a mere pittance—about $500 for each loan. Both loans went unpaid and the houses eventually went into foreclosure. After the government learned of the fraud, Robers waived indictment and pleaded guilty to an information charging him with one count of conspiracy to commit wire fraud.

After Robers pleaded guilty, the United States Probation Office prepared a Presentence Investigation Report ("PSR"). Of relevance to this appeal, the PSR recommended that Robers should be required to pay $218,952.18 in restitution, pursuant to the Mandatory

Victims Restitution Act of 1996, 18 U.S.C. § 3663A "(MVRA"). Robers objected to the $218,952.18 figure, arguing that his minor role in the offense and his limited economic circumstances should result in a total restitution obligation of $4,800. Robers also claimed that the proposed restitution award improperly held him responsible for the decline in real estate values and consequential and incidental expenses.

At sentencing, the government argued that neither Robers's limited role in the offense nor his limited resources justified a lower restitution amount, jointly and severally owed by all of the participants in the scheme. The government then presented testimony from two witnesses to establish the amount of restitution. First, Jim Farmer, a representative of Mortgage Guaranty Insurance Corporation ("MGIC"), testified that MGIC had insured the Grant Street mortgage (which was owned by Fannie Mae) and that Fannie Mae had submitted a claim for $159,214.91, which included unpaid principal, accrued interest, attorney's fees, property taxes, and other related expenses. Farmer explained that MGIC had the option of paying a percentage of the claim or paying the full amount of the loss and acquiring the real estate and then liquidating it. MGIC chose to do the latter and was able to reduce the amount of its loss to $52,952.18, which was lower than the amount it would have had to pay had it paid a percentage of Fannie Mae's claim. In mitigating its loss, though, MGIC incurred additional expenses, such as hazard insurance, yard maintenance, and the realtor's commission.

FBI Special Agent Michael Sheen also testified at the sentencing hearing. After detailing how the scheme operated, he explained that the Inlet Shores house had a mortgage note of $330,000 owned by American Portfolio and that the foreclosed real estate eventually sold for $164,000, resulting in a $166,000 loss. There were additional expenses related to the foreclosure sale, but American Portfolio had not responded to the government's request for additional information. Accordingly, the amount of restitution requested for the Inlet Shores mortgage was limited to $166,000.

The district court sentenced Robers to three years' probation—a below-Guideline sentence. Based on the testimony at the sentencing hearing, the district court ordered restitution of $166,000 to American Portfolio and $52,952.18 to MGIC, for a total restitution award of $218,952.18. Robers's co-conspirators who were involved with the procurement of the Grant Street and Inlet Shores mortgages were also ordered to pay restitution in the same amounts and the restitution awards were all entered with joint and several liability.[2] Robers appeals, challenging only the restitution award.

---

[2] Restitution in the amount of $166,000 was ordered to American Portfolio, due jointly and severally with Jose Cortez Valadez, Case No. 07-CR-158 and John Boumenot, Case No. 09-CR-194. And restitution of $52,952.18 was ordered to MGIC jointly and severally with James Lytle, Case No. 07-CR-113, Bradley Hollister, Case No. 08-CR-229, and Eric Meinel, Case No. 09-CR-217.

## II. Analysis

On appeal, Robers argues that the district court erred in calculating the amount of restitution based on the eventual resale value of the foreclosed real estate. Robers maintains that the district court should have based the restitution award instead on the fair market value of the real estate at the date of foreclosure, and that by using the eventual resale proceeds of the houses he was wrongly held responsible for the decline in their value. Robers also argues that many of the miscellaneous expenses included in the loss calculation for the Grant Street house are consequential or incidental damages that are not properly considered in a restitution award.[3] While generally we review a restitution order deferentially, reversing only for an abuse of discretion, both of Robers's arguments present questions of the award's legality. As such, our review is *de novo*. *United States v. Webber*, 536 F.3d 584, 601 (7th Cir. 2008) ("We review de novo questions of law regarding the federal courts' authority to order restitution; we review for abuse of discretion a district court's calculation of restitution, taking the evidence in the light most favorable to the Government.") (internal citations omitted). *See also United States v. Yeung*, 672 F.3d 594, 600 (9th Cir. 2012) ("We review the legality of a restitution order, including the district court's valuation method, de novo.").

---

[3] Robers does not argue on appeal that his minor role in the offense and his limited economic circumstances should reduce the restitution amount.

### A. *Offset Value*

#### 1. The statutory language

The MVRA governs federal criminal restitution and provides, in relevant part, that a sentencing court "shall order" defendants convicted of certain crimes to "make restitution" to their victims.[4] 18 U.S.C. § 3663A(a)(1). In the case of a crime "resulting in damage to or loss or destruction of property of a victim," the statute further provides that the order of restitution shall require the defendant to:

> (A) return the property to the owner of the property or someone designated by the owner; or
>
> (B) if return of the property under subparagraph (A) is impossible, impractical, or inadequate, pay an amount equal to the greater of—
>
>> (i) the value of the property on the date of the damage, loss, or destruction, or
>>
>> (ii) the value of the property on the date of sentencing,
>
> less the value (as of the date the property is returned) of any part of the property that is returned.

18 U.S.C. § 3663A(b)(1).

---

[4] Robers agreed that the ultimate victim of the Inlet Shores fraud was American Portfiolio and that MGIC was the ultimate victim of the Grant Street fraud.

Robers argues that the plain language of the MVRA required the district court to reduce the restitution award by the value of the mortgaged real estate as of the date of foreclosure because that is the value "as of the date the property is returned." He contends that it was legal error for the court to calculate the offsetting amount based on the eventual resale prices of the real estate because the houses were resold many months after the foreclosure actions gave title to the victim lenders.[5] And with the burst of the real estate bubble in the mid-2000s, Robers maintains that the houses sold for less, not based on his fraud, but for other unrelated reasons. The government responds that Robers's argument misreads the MVRA and argues that under the plain language of the MVRA, the restitution award is only reduced at the time that the mortgaged collateral is sold because cash is the property that was taken and cash is only returned at that point in time.

We agree with the government. More specifically, we hold that in calculating a restitution award where, as in this case, cash is the property taken, the restitution amount is reduced by the eventual cash proceeds recouped once any collateral securing the debt is sold.

We reach this holding based on the plain language of the MVRA. The MVRA states that the restitution award is reduced by "the value (as of the date *the property* is

---

[5] The Inlet Shores house was sold 31 months after foreclosure but it is unclear from the record when the Grant Street real estate was sold.

returned) of any part of *the property* that is returned." 18 U.S.C. § 3663A(b)(1)(B)(ii) (emphasis added). Read in the context of the statute, "the property" must mean the property originally taken from the victim. The applicable subsection of the MVRA first addresses the situation we have here—where there is "damage to or loss or destruction of property of a victim of the offense." In this case the "loss" the victims suffered was a significant amount of cash. Next, it refers to the return of "the property to the owner." 18 U.S.C. § 3663A(b)(1). In this case, since the property taken from the victims was cash, the two houses purchased with the cash were not the property taken from the lenders, but rather were collateral that secured the cash loans. The two cannot be equated. Cash is liquid. Real estate is not. The victim-lender was defrauded out of cash and wants cash back; the victim does not want the houses and they do not, in any way, benefit from possessing title to the houses until they are converted into cash upon resale. Under the plain language of the statute, what matters is when at least part of the cash was returned to the victims—not when the victims received title to the houses securing the loans. And the cash was returned to the victims only when the collateral houses securing the loans were eventually resold.

Our interpretation of the MVRA gives the phrase "the property" a consistent meaning throughout the statute: It always means "the property stolen." Robers's interpretation, on the other hand, seeks to give the phrase "the property" a different meaning within the same statutory section. Under Robers's interpretation

the property returned would be the collateral houses and their estimated value at the time the victim receives title. However, "[t]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Matter of Merchants Grain, Inc. By and Through Mahern*, 93 F.3d 1347, 1356 (7th Cir. 1996) (quoting *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)). The MVRA directs the court to offset the loss by "the value (as of the date the property is returned) of any part of the property that is returned." Under Robers's interpretation "any part" of the property returned would have to refer to the collateral house. Obviously part of a house cannot be returned. Nor can a house (or any part of a house) be the same as cash. It is only when "the property" means "the property stolen" (cash) that the *"any part"* language makes sense, because then it is possible to return only a part of the property. A house is not part of the cash. Thus, our reading both gives the phrase "the property" a consistent meaning throughout the MVRA and does not render the *"any part"* language of the statute superfluous or nonsensical.

### 2. The MVRA's statutory goal

The MVRA's overriding purpose is "to compensate victims for their losses." *United States v. Pescatore*, 637 F.3d 128, 138 (2d Cir. 2011) (internal quotations omitted). And

> [b]ecause the MVRA mandates that restitution be ordered to crime victims for the "full amount" of

losses caused by a defendant's criminal conduct, *see* 18 U.S.C. § 3664(f)(1)(A); *United States v. Reifler*, 446 F.3d at 134 . . . , it can fairly be said that the "primary and overarching" purpose of the MVRA "is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being."

*United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006) (quoting *United States v. Simmonds*, 235 F.3d 826, 831 (3d Cir. 2000).

Our holding is consistent with the goals of the MVRA, as well as the concept of restitution. The offset amount for purposes of restitution is the cash recouped following the disposition of the collateral. Otherwise the victims would not be made whole again because the eventual sales proceeds could be, as they were in this case, woefully inadequate to fully compensate the victims for their loss and to put them in the position they would have been absent the fraud.

Robers claims otherwise, asserting that our reading of the MVRA makes him the insurer of real estate values and improperly holds him responsible for declines in the real estate market. Robers then posits that the victims' losses in this case were caused by the collapse of the real estate market and not his fraud. Therefore holding him responsible for the further decline in the real estate values—after the victims acquired title to the houses—violates the underlying purpose of the MVRA.

Not so. Contrary to Robers's argument, his fraud actually caused the losses at issue here. Absent his fraudu-

lent loan applications, the victim lenders would not have loaned the money in the first place. Likewise the mortgage notes would not have been extended, not paid, and then defaulted upon. And the banks would not have had to foreclose on and then resell the real estate in a declining market at a greatly reduced value.

The decline in the real estate market does not mitigate his fraud. Robers lied about several things—his intent to reside in the house as his primary residence, his promise to pay the mortgage, his inflated income, and his exaggerated asset value. Absent Robers's fraud, the decline in the real estate market would have been irrelevant: Assuming he actually qualified for the loans, he would be living in the house and making the mortgage payments out of the income he claimed to be earning. If his assets had the value he claimed, he would not want to risk using them to satisfy any deficiency following a foreclosure sale. The declining market only became an issue because of Robers's fraud. *See Yeung*, 672 F.3d at 603 n.5 ("[H]ere Yeung created the circumstances under which the harm or loss occurred through her use of false information that induced the Long Beach Trust to purchase the loan. Because the Long Beach Trust's loss is directly related to Yeung's offense, the declining value of the real estate collateral, even if attributable to general financial conditions, does not disrupt the causal chain, and the victims of the fraud are entitled to restitu-

tion.") (internal citation omitted).[6] Essentially Robers wants a bailout, leaving the victims of his fraud to suffer the consequences of his deceit. Robers, not his victims, should bear the risk of market forces beyond his control. *See United States v. Rhodes*, 330 F.3d 949, 954 (7th Cir. 2003) ("[The defendant], rather than the victims, should bear the risk of forces beyond his control." (quoting district court opinion)).

If the real estate values increased, thereby allowing the creditor to resell the houses at a higher amount than owed, the bank would not be entitled to a restitution award. Similarly, if the increased sales price merely reduced the bank's loss, it would obviously be error for the district court to order restitution based on the earlier lower market value because "[t]he VWPA and MVRA ensure that victims recover the full amount of their losses, but nothing more." *United States v. Newman*, 144 F.3d 531, 542 (7th Cir. 1998). *See also United States v. Smith*, 156 F.3d 1046, 1057 (10th Cir. 1998) ("[A] district court may not order restitution in an amount that exceeds the loss caused by the defendant's conduct. Such a restitution order would amount to an illegal sentence. [T]he imposition of an illegal sentence constitutes plain error.") (internal quotations omitted). Thus, what Robers truly seeks is a one-way ratchet. But "the 'intended beneficiaries' of the MVRA's procedural mechanisms 'are the

---

[6] Contrary to our holding, *Yeung* held that the offset value for purposes of restitution is the collateral's value at the time title transfers to the loan holder. *See infra* at 25-28.

victims, not the victimizers.'" *United States v. Moreland*, 622 F.3d 1147, 1172 (9th Cir. 2010) (quoting *United States v. Grimes*, 173 F.3d 634, 639 (7th Cir. 1999)).[7]

### 3. Seventh Circuit precedent

Our holding is consistent with this circuit's previous decisions reached in non-precedential orders. In *United States v. Cage*, 365 Fed. App'x 684, 687 (7th Cir. 2010), this court stated:

> The restitution amount proposed by the government and adopted by the court at sentencing was the amount in mortgage loans that Cage helped to fraudulently secure less the amount the lenders recovered through the sale of the fraudulently purchased properties. This was a proper way to calculate the amount of restitution [] owed . . . .

---

[7] If a district court had entered a restitution order based on the estimated fair market value of the real estate prior to resale and the eventual sales proceeds ended up higher, a defendant could come back to court and request that the restitution award be reduced. Rather than speculate and then later adjust the restitution award, we believe the better approach is to do what, according to the government, the Eastern District of Wisconsin does: If the collateral real estate has not been sold by the time of sentencing, the court enters a restitution award for the total loss to the victims and once the real estate is sold, the court modifies the restitution award based on the cash proceeds.

And in *United States v. Bates*, 134 Fed. App'x 955 (7th Cir. 2005), we explained the difference between the property stolen (cash) and the property returned (real estate collateral) stating:

> Bates insists that Coldwell did not suffer any compensable loss because it ended up with the residence, and that the "loss" claimed by the realtor in fact consists of unrecoverable "incidental and consequential damages" and "lost profits." Bates, though, did not take a house from Coldwell; she caused the realtor to lose cash, but cash is not what was "returned" to Coldwell. Coldwell assumed temporary ownership of the residence only as a means of mitigating Bates's fraud, and so long as Coldwell possessed a residence it did not want instead of the funds Bates caused it to expend, the realtor was not made whole—Bates's fraud placed Coldwell in the position of real estate seller rather than realtor.

*Id.* at 958.

These Seventh Circuit decisions, though, as noted, are non-precedential.[8] The other circuits are split on the

---

[8] In *United States v. Shepard*, 269 F.3d 884, 888 (7th Cir. 2001), this court also considered the question of the appropriate amount of offset, but *Shepard* is distinguishable from the case at hand. In *Shepard*, the defendant argued that "he and his wife 'returned' about $12,000 of the [stolen] $92,000 by using it to make improvements in [the victim's] home." *Id*. at 887. We noted that "to the extent improvements increased the

(continued...)

appropriate offset amount to use in calculating restitution.[9] In a series of cases, the Ninth Circuit has held

---

[8] (...continued)
market value of [the victim's] house, and thus were (or could have been) realized by [the victim's] estate in selling the property, the funds were 'returned' for statutory purposes." *Id*. We continued: "It is no different in principle from taking the money from one of [the victim's] bank accounts and depositing it in another a week later. So long as [the victim] regained beneficial use of the property, it has been 'returned' as § 3663A(b)(1)(B)(ii) uses that term." *Id*. at 887-88. In *Shepard*, though, the government did not contend that the "the change of the property's form—from cash to, say, central air conditioning—precludes a conclusion that the property has been 'returned.'" *Id*. at 888. Moreover, in *Shepard*, the victim was using and benefitting from the home improvements, whereas in this case, the victims were not using the collateral, but were merely attempting to sell the collateral to recoup their stolen property—cash. Finally, while *Shepard* remanded the case for determination of "the amount by which improvements enhanced the market value of the house," there was no discussion concerning the appropriate time for this valuation, i.e., upon resale of the house or at the time the home improvements were made. *Id*. Thus, *Shepard* does not answer the question before us.

[9] The following cases interpret both the MVRA and its predecessor, the Victim and Witness Protection Act of 1982 ("VWPA"). Unlike the MVRA, the VWPA required courts to consider the economic circumstances of the defendant prior to ordering restitution, and the granting of restitution was discretionary, not mandatory. *See* 18 U.S.C. § 3663. "With

(continued...)

that the offset amount is the fair market value of the collateral real estate at the date of foreclosure when the victim-lender took title and could have sold it for cash. *See United States v. Smith*, 944 F.2d 618, 625-26 (9th Cir. 1991); *United States v. Hutchison*, 22 F.3d 846, 856 (9th Cir. 1993); *United States v. Catherine*, 55 F.3d 1462, 1465 (9th Cir. 1995); *United States v. Davoudi*, 172 F.3d 1130, 1135 (9th Cir. 1999); *United States v. Gossi*, 608 F.3d 574, 578 (9th Cir. 2010); *United States v. Yeung*, 672 F.3d 594, 605 (9th Cir. 2012). The Second and Fifth Circuits have similarly held that in a mortgage fraud case, the restitution offset is based on the fair market value of the collateral at the time it is returned to the victim. *See United States v. Boccagna*, 450 F.3d 107, 120 (2d Cir. 2006); *United States v. Holley*, 23 F.3d 902, 915 (5th Cir. 1994). Conversely, the Third, Eighth, and Tenth Circuits have held that it is proper to base the offset value on the eventual amount recouped by the victim following sale of the collateral real estate. *See United States v. Himler*, 355 F.3d 735, 745 (3d Cir. 2004); *United States v. Statman*, 604 F.3d 529, 538 (8th Cir. 2010); *United States v. James*, 564 F.3d 1237, 1246-47 (10th Cir. 2009).

---

[9] (...continued)

these exceptions, the two statutes are identical in all important respects, and courts interpreting the MVRA may look to and rely on cases interpreting the VWPA as precedent." *See United States v. Gordon,* 393 F.3d 1044, 1048 (9th Cir. 2004).

**4. Circuits holding that the offset value is determined based on the estimated fair market value of the collateral securing the loans at the date of foreclosure when title is transferred to the lender**

Our conclusion conflicts with the view of the Ninth, Fifth, and Second Circuits. As noted above, those courts all held that the offset amount is the estimated fair market value of the collateral at the date of foreclosure. In reaching this conclusion, the courts all purported to rely on the plain language of the MVRA, stressing that under the MVRA, courts are to reduce the restitution award by "the value (as of the date *the property* is returned)." But none of those cases actually addressed the question of what constitutes "the property" under the statute. And their conclusions are based on the courts improperly treating the collateral recovered as the property stolen.

**a. The Ninth Circuit**

Examining the development of the case law in the Ninth Circuit illuminates this omission. *Smith* was the first of the cases to consider the appropriate offset in a similar situation—where the victim lent cash based on the defendant's fraud and eventually foreclosed on the real estate securing the loan. *Smith*, 944 F.2d at 620-21. In *Smith*, the defendant asserted "that the district court failed to give him adequate credit against the restitution amount for the value of the collateral property," arguing that the court should have used the value of the

real estate at the time the victims regained title to the property. *Id.* at 625. Smith alleged "that because the value of Texas real estate steadily declined through-out the time in question, the measurement of the property's value at the later dates resulted in an inade-quate credit for the collateral property, and that there-fore the restitution figure is far too high." *Id.* The Ninth Circuit agreed with defendant Smith. And *Smith* serves as the linchpin for further cases. Because the court went astray in *Smith* by applying language in the much different property restitution case (*Tyler*), we quote its reasoning in full:

> We agree with Smith that the district court used incorrect dates in valuing the property. The Act pro-vides that if a victim has suffered a loss of property, the district court may order restitution in the amount of this loss "less the value (*as of the date the property is returned* ) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1) (emphasis added). We interpreted this portion of the Act in *United States v. Tyler*, 767 F.2d 1350 (9th Cir. 1985) (*Tyler*), in which Tyler pled guilty to theft of timber and was ordered to pay restitution under the Act. The district court determined the amount of restitu-tion as the difference between the value of the timber at the time of sentencing and the higher value at the time of theft. *Id.* at 1351. Because the government recovered the timber on the day of the theft, however, we concluded that "[a]ny reduction in its value stems from the government's decision to hold the timber during a period of declining prices, not

from Tyler's criminal acts." *Id.* at 1352. The value of the property "'as of the date the property [was] returned'" equaled the amount lost when the timber was stolen, and therefore restitution under the Act was inappropriate. *Id.* (quoting 18 U.S.C. § 3579, which was subsequently renumbered as 18 U.S.C. § 3663).

The same reasoning should apply in determining the value of the collateral property in this case. Smith should receive credit against the restitution amount for the value of the collateral property as of the date title to the property was transferred to either Savings & Loan or Gibraltar. As of that date, the new owner had the power to dispose of the property and receive compensation. *Cf.* 18 U.S.C. § 3663(e)(1) (restitution may be ordered for any person who has compensated a victim). Value should therefore be measured by what the financial institution would have received in a sale as of that date. Any reduction in value after Smith lost title to the property stems from a decision by the new owners to hold on to the property; to make Smith pay restitution for that business loss is improper. *See Tyler*, 767 F.2d at 1352. The victims in this case "receive[d] compensation" when they received title to the property and the corresponding ability to sell it for cash; the value of the compensation should therefore be measured and deducted from the total loss figure as of the date title was transferred. 18 U.S.C. § 3663(e)(1). Because the law is clear, to do otherwise would be an abuse of discretion.

*Id.* at 625-26.

There are several flaws in *Smith*'s reasoning. First, *Smith* quoted, with emphasis, the "less the value (as of the date the property is returned)" language from the MVRA, but ignored the fact that the property returned was not the property stolen. *See Smith*, 944 F.2d at 631-32 (O'Scannlain, J., dissenting) (explaining that the majority "erroneously treats the five collateral properties as if they are somehow equivalent to the stolen capital," but "[w]hat Smith stole was capital, and to restore his victims to the status quo ante, he must return the present value of that capital."). Second, and relatedly, the Ninth Circuit in *Smith* relied heavily on its decision in *Tyler* to support its reasoning, but *Smith*'s reliance on *Tyler* was misplaced because in *Tyler*, the defendant was charged with theft of government timber and the exact same property (i.e., the timber) was recovered on the very day of the theft. Thus, *Tyler* does not support the view that "the property" in the MVRA means any property returned, as opposed to the property stolen. *See Smith*, 944 F.2d at 632 (O'Scannlain, J., dissenting) ("Nor does our decision in *United States v. Tyler*, 767 F.2d 1350 (9th Cir. 1985), upon which both the majority and Smith rely, support the court's holding. *See ante* at 624-25. A defrauded lender's assumption of title over collateral property that is itself part of the fraud is in no way analogous to a timber owner's recovery of stolen timber.") Third, *Smith* reasoned that as of the date the victim received title to the collateral, the new owner had the power to dispose of the real estate and receive compensation, and accordingly the value of the real estate should be based on the amount

the financial institution would have received in a sale as of that date. This reasoning ignores the reality that real property is not liquid and, absent a huge price discount, cannot be sold immediately. Fourth and finally, the court in *Smith* unreasonably assumed that any reduction "after Smith lost title to the property stems from a decision by the new owners to hold on to the property." *Smith*, 944 F.2d at 625. This rationale also incorrectly assumes that real estate is liquid—which it is not.

We say all of this because the Ninth Circuit's decision in *Smith* served as the keystone for all of the subsequent decisions holding that the offset value is the fair market value of the collateral real estate on the date the title to the collateral reverted to the victim. For instance, in *United States v. Hutchinson*, 22 F.3d 846 (9th Cir. 1993), the defendant challenged the district court's use of the final sales price as the offset value. Based on *Smith*, the Ninth Circuit agreed that the appropriate offset was the value of the collateral at the time the bank gained control of the real estate. Similarly, in *United States v. Catherine*, 55 F.3d 1462 (9th Cir. 1995), the defendant argued that the district court should have valued the real estate for offset purposes at the time the victim foreclosed on the collateral real estate, and the Ninth Circuit stated: "We decided this exact issue in *Hutchinson*, *id.* at 854-56, which in turn, relied on *United States v. Smith*." *Id.* at 1465. The court in *Catherine* then followed these precedents and reversed and remanded the case for the district court to value the collateral at the time the bank received title. *Id.* And in *United States v. Davoudi*, 172 F.3d 1130 (9th Cir. 1999),

the Ninth Circuit again held that the district court erred in basing its offset valuation on the eventual sales price of the collateral. *Davoudi* parroted *Smith*'s reasoning and cited *Smith, Catherine*, and *Hutchinson*. Then in *United States v. Gossi*, 608 F.3d 574 (9th Cir. 2010), the Ninth Circuit relied on *Davoudi*, to conclude: "Under this Court's precedent, the district court reasonably found that [the victim] had the power to dispose of the property at the time it took control of the property at foreclosure. 'Value should therefore be measured by what the financial institution would have received in a sale as of that date.'" *Id.* at 578 (quoting *Smith*, 944 F.2d at 625).

The final and most recent decision from the Ninth Circuit is *United States v. Yeung*, 672 F.3d 594 (9th Cir. 2012). In *Yeung*, the court considered the propriety of several restitution orders to financial institutions which suffered losses following a fraudulent real estate scheme and stated:

> Using the framework set forth in § 3663A(b), we have developed some guidelines for calculating the restitution amount in a case involving a defendant's fraudulent scheme to obtain secured real estate loans from lenders. Generally, district courts calculating a direct lender's loss in this context begin by determining the amount of the unpaid principal balance due on the fraudulent loan, less the value of the real property collateral as of the date the direct lender took control of the property. *United States v. Hutchison*, 22 F.3d 846, 856 (9th Cir. 1993); *United States v. Smith*, 944 F.2d 618, 625-26 (9th Cir. 1991)

(construing the VWPA). Because restitution should address a victim's "actual losses," *see Smith*, 944 F.2d at 626, we have approved restitution awards that included other amounts in the calculation of loss, such as prejudgment interest (using the governmental loan rate), *id.,* interest still due on the loan, *Davoudi*, 172 F.3d at 1136, and expenses associated with holding the real estate collateral that were incurred by the lender before it took title to the property, *Hutchison*, 22 F.3d at 856. To calculate the value of the real property collateral "as of the date the property is returned," § 3663A(b)(1)(B)(ii), courts use the value of the collateral "as of the date the victim took control of the property," *Davoudi*, 172 F.3d at 1134. The lender does not take control of the collateral merely by triggering the foreclosure process. *See United States v. Gossi,* 608 F.3d 574, 578 (9th Cir. 2010). Rather, the lender generally takes control on the date the lender either (1) receives the net proceeds from the sale of the collateral to a third party at the foreclosure sale, *see United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009), or (2) takes title to the real estate collateral at the foreclosure sale, at which time "the new owner had the power to dispose of the property and receive compensation," *see Smith,* 944 F.2d at 625. The direct lender's losses may also be reduced by amounts recouped from resale of the loan or from other types of "return" of property. *See, e.g., Hutchison*, 22 F.3d at 856.

*Id.* at 601.

On the basis of this precedent, the Ninth Circuit in *Yeung* then reversed the district court's restitution awards, which were based on the subsequent sales price of the real estate, and remanded to the district court.[10]

As the above excerpt from *Yeung* makes clear, its holding was based on the well-established precedent that flowed from *Smith.* And as discussed above, none of those cases addressed the fundamental distinction between the property stolen (cash) and the property recovered (real estate). Like its predecessors, *Yeung* did not recognize that the *Smith* decision relied on *Tyler*, which was factually distinguishable from all of the

---

[10] *Yeung* also held that "when a victim purchased a loan in the secondary market, that is, where the victim is the loan purchaser as opposed to the loan originator . . . the value of that loan is not necessarily its unpaid principal balance, but may vary with the value of the collateral, the credit rating of the borrower, market conditions, or other factors, [and thus] the loan purchaser may have purchased the loan for less than its unpaid principal balance." *Yeung*, 672 F.3d at 601-02. The Ninth Circuit in *Yeung* then remanded the case to the district court to recalculate the restitution award. Robers filed *Yeung* as supplemental authority and argued that, as in *Yeung*, remand is required to determine the price at which the loans were purchased in the secondary market. Robers, however, had never previously argued (either before the district court or in briefing or at oral argument) that the restitution award was improperly based on the outstanding principal balance, as opposed to some potentially lower amount paid for the loans in the secondary market. Therefore, he has waived these issues.

cases at hand because *Tyler* involved a case where the property the defendant was charged with stealing was the same as the property returned to the victim (timber) and the theft and return happened on the same day.

### b. The Fifth Circuit

The *Smith* decision has likewise served as the basis for other circuits holding that the offset value is the value of the collateral at the time of foreclosure. In *United States v. Holley*, 23 F.3d 902, 915 (5th Cir. 1994), the Fifth Circuit, like the Ninth Circuit, held that the offset value should be based on the fair market value on the date of foreclosure. In coming to this conclusion, the Fifth Circuit first stated that its decision in *United States v. Reese*, 998 F.2d 1275 (5th Cir. 1993), dictated the result. It noted that in *Reese* it had

> explained that "it would appear that the 'property' as to which [the savings and loan] might have suffered 'damage to or loss or destruction of' could only be loan proceeds funded in cash at the original closing of [the improperly extended] loan." *Id.* at 1283. However, we also explained that when the real property that secures such a loan is deeded back to the financial institution, "the value of such property should constitute a partial return of the 'cash loan proceeds.'" *Id.* at 1284.

*Holley*, 23 F.3d at 915.

But the court's reasoning in *Reese* was limited to this statement: "Conceptually, it would seem to us that

when a lender accepts conveyance of the se-
cured property in lieu of foreclosure, the value of
such property should constitute a partial return of the
'cash loan proceeds.'" *Reese*, 998 F.2d at 1284. This rea-
soning ignores the fact that the victim accepted the col-
lateral real estate, not in lieu of the cash proceeds, but
in order to sell and recoup the cash proceeds.

After citing the reasoning of *Reese*, the court in *Holley*
then turned to *Smith*, stating:

> The *Smith* court held that the defendant "should
> receive credit against the restitution amount for
> the value of the collateral property as of the date
> title to the property was transferred" to the FSLIC's
> successor. *Id.* at 625. The court reasoned that, as of
> that date, "the new owner had the power to dispose
> of the property and receive compensation." *Id.* The
> *Smith* court concluded that the value of the returned
> property "should therefore be measured by what
> the financial institution would have received in a
> sale as of that date. Any reduction in value after
> [the defendant] lost title to the property stems
> from a decision by the new owners to hold on to
> the property." *Id.*

*Holley*, 23 F.3d at 915.

Unlike the Ninth Circuit's decision in *Smith*, the Fifth
Circuit in *Holley* at least acknowledged the government's
argument "that the 'property' that was lost was [the
bank's] capital and that the return of [the real estate] to [the
bank] represents only the return of the collateral for the

actual property involved in this case" and that it was not until that collateral was sold for cash that the victim regained its property. *Id*. But *Holley* did not provide any basis for ignoring this distinction, other than citing its previous decision in *Reese*. *See id.* And *Reese* merely concluded that there was no "conceptual" difference. *Reese*, 998 F.2d at 1284. However, as explained above, the two are not conceptually equivalent: cash is liquid, real estate is not; the collateral secured the cash loan—it was not the cash loan; and the victim had cash before the fraud and wanted cash back as its returned property. In short, we find the Fifth Circuit's reasoning in *Reese* unpersuasive and thus its decision in *Holley* adds nothing to the analysis.

### c.  The Second Circuit

Finally, the Second Circuit addressed the issue of offset value in *United States v. Boccagna*, 450 F.3d 107 (2d Cir. 2006). In *Boccagna*, the defendants were charged in a mortgage fraud scheme involving the United States Department of Housing and Urban Development ("HUD"). *Id.* at 109-110. HUD foreclosed on the collateral and then resold the real estate at a fraction of their fair market value to the New York City Department of Housing Preservation and Development in order to further its mission to develop low-cost housing. *Id.* at 110. When considering the appropriate amount by which to offset the victim's loss, the *Boccagna* court initially noted that the government did not argue that "the property that is returned" language of the MVRA only applies to actual

cash and not to "any property that HUD obtained after default." *Id.* at 112 n.2. The court then said that "[s]uch an argument would not be convincing," but based its holding on precedent from the Fifth and Ninth Circuits.[11] *Id. Boccagna* explained:

> As two of our sister circuits, construing identical offset language in the Victim and Witness Protection Act, codified at 18 U.S.C. § 3663, have concluded, when a lender victim acquires title to property securing a loan, "the value of such property should constitute a partial return of the cash loan proceeds." *United States v. Holley,* 23 F.3d 902, 915 (5th Cir. 1994) (internal quotation marks omitted); *see United States v. Smith,* 944 F.2d 618, 625 (9th Cir. 1991) (holding that defendant "should receive credit against the restitution amount for the value of the collateral property as of the date title to the property was transferred" to lender victim).

*Boccagna*, 450 F.3d at 112 n.2.

The Second Circuit in *Boccagna* then went on to hold that the offset value should generally be based on the fair market value of the real estate at the time of foreclosure. *Id.* at 109. *Boccagna*, thus, adds nothing to the analysis, having merely relied on *Holley* and *Smith*—which were incorrect for the reasons noted above.

---

[11] The court in *Boccagna* also cited this court's decision in *Shepard*. But as discussed above, *see supra* at 17-18 n.8, *Shepard* is distinguishable.

In sum, as our detailed discussion of the Ninth, Fifth and Second Circuits' decisions explains, those decisions all relied on the keystone decision in *Smith*. And the Ninth Circuit's reasoning in *Smith* is flawed for several reasons: *Smith* purported to rely upon the statutory language but ignored the distinction between the property stolen (cash) and the property returned (real estate). Compounding this error was *Smith*'s reliance on *Tyler* which was factually distinct. In *Tyler*, the defendant was charged with stealing timber and the property recovered—on the same day as the theft—was timber. Thus, *Tyler* does not answer the question of the appropriate offset value where the property stolen and returned differ. The Ninth Circuit in *Smith* also treated real estate as a liquid asset. But it was not liquid because the collateral could not be turned into cash the same day title transferred. The court misconstrued the market forces by assuming that the only reason collateral would not be immediately turned into cash would be a deliberate decision by the victim to hold on to the property. Beyond *Smith*'s faulty reasoning, the only additional rationale for using the value of real estate at the time the victim obtained title to the collateral was the Fifth Circuit's view in *Reese* that, conceptually, obtaining title to real estate is the same as receiving cash. But it is not: real estate is not liquid; it is not what was stolen; it is not what the victim wants; and it does not benefit the victim in any way until it is turned back into cash upon resale. Accordingly, it is only when the real estate is converted into cash through a future sale that the offset value should be determined. The plain language of the

MVRA dictates this conclusion because "the value (as of the date *the property* is returned)," 18 U.S.C. § 3663(b) (emphasis added), in the context of the statute must mean the property taken from the victim. But even if there were any ambiguity in the meaning of "the property," we would interpret that language to best achieve the statutory goal of the MVRA—to make the victim whole—and this goal is best achieved by calculating restitution based on the actual cash proceeds recouped following the resale of any collateral real estate.

### 5. Circuits holding that the offset value is determined based on the cash proceeds recouped following resale of the collateral real estate.

This brings us now to the decisions from the Third, Eighth and Tenth Circuits, which have all held that their respective district courts correctly used, as the offset value for calculating restitution, the eventual proceeds recouped following a foreclosure sale.[12]

### a. The Third Circuit

The Third Circuit addressed this issue in *United States v. Himler*, 355 F.3d 735 (3d Cir. 2004). In *Himler*, the defen-

---

[12] As discussed earlier, *see supra* at 23, Judge O'Scannlain dissented in the pivotal Ninth Circuit opinion (*United States v. Smith*), preferring the same approach to the offset valuation later approved by the Third, Eighth, and Tenth Circuits.

dant had fraudulently purchased a condominium by tendering false checks to a settlement company that in turn paid the seller $193,833. *Id.* at 737. The district court ordered Himler "to pay restitution in the amount of $193,833—to be reduced by the ultimate net proceeds from the sale of the condominium." *Id.* at 744. The Third Circuit upheld that award, noting first that the victim in this case "was not a seller of the condominium who was returned to his or her pre-crime position upon reobtaining title to the condominium. Rather, [the victim] was the settlement company that facilitated the purchase and sale between [the seller] and [the defendant]." *Id.* And deeding the collateral real estate back to the settlement company did not adequately compensate the victim for its loss.[13] *Id.* at 744-45. The Third Circuit then noted that the government had conceded that the statute requires a district court to "value" the property "as of the date the property is returned" to the victim. *Id.* at 745. But the court agreed with the government that the district court did not abuse its discretion in entering a restitution order that would be reduced by the future proceeds from the real estate's sale. *Id.* In reaching this conclusion, the court noted that, had the offset amount been determined prior to its sale, the defendant would have been left with a high bill because market forces

---

[13] In *Himler*, the court also noted that the defendant had purchased the condominium at an inflated price ($193,833) while other similar condominiums were selling between $150,000 and $160,000. *Himler*, 355 F.3d at 744.

allowed the condominium to sell for $181,000, whereas at the time title transferred to the settlement company, similar condominiums were selling for $150,000 to $160,000. *Id.*

In *Himler*, the Third Circuit seemed to rely on the fact that the defendant was in a better position under the district court's approach because the real estate values had increased between the time title transferred and the resale. *Id.* at 745. Obviously, we have the converse here, but what *Himler*'s reasoning illustrates is that with fluctuating real estate values, the only way to measure the true loss to the victim is by looking to the actual resale price of the collateral real estate. Under the MVRA, the actual loss is the appropriate measure of restitution.

### b. The Tenth Circuit

In *United States v. James*, 564 F.3d 1237 (10th Cir. 2009), the Tenth Circuit also upheld a restitution award that calculated the total loss by subtracting the eventual resale price of the collateral real estate from the initial loan proceeds. *Id.* at 1246-47. In *James*, the Tenth Circuit reasoned that "[b]ecause, in this case, the foreclosure price method more closely reflects the actual loss [the victim] experienced, we cannot say the district court's method of using that value was unreasonable or that it otherwise erred in using that valuation method in determining the amount of restitution under the MVRA." *Id.*

### c. The Eighth Circuit

Similarly, in *United States v. Statman*, 604 F.3d 529 (8th Cir. 2010), the Eighth Circuit upheld the district court's use of the eventual proceeds from a foreclosure sale as the offset value. *Id.* at 538. In that case, the defendants had been charged with wire fraud in relation to a scheme to purchase a business. *Id.* at 532. Among other things, in purchasing the business they assumed a bond secured by real estate. *Id.* at 536. Following their conviction for fraud, at sentencing defendant Rund objected to the government's methodology for calculating restitution. *Id.* at 537. Then on appeal Rund argued that "the district court erred because the loss to [the victim] should not have been calculated based on the alleged foreclosure sale price but [, instead, on] the assessed value of the properties." *Id.* The court rejected Rund's approach, which, as the Eighth Circuit explained, "would have this court use the appraised value of the foreclosed property to calculate the loss amount, which would result in a lower restitution payment to [the victim]." *Id.* In rejecting Rund's approach, the Eighth Circuit stressed the overarching goal of the MVRA—making crime victims whole—and then concluded that "[u]nder the circumstances of this case, the district court's use of the foreclosure sale price provided a fair and adequate representation of [the victim's] loss and satisfied the overarching goal of the MVRA, to make [the victim] whole." *Id.*

The *Himler*, 355 F.3d 735, *Statman*, 604 F.3d 529, and *James*, 564 F.3d 1237, decisions all support our conclusion

today that the offset value is best determined by the money eventually recouped upon the resale of the collateral real estate. This conclusion is consistent with the plain meaning of the MVRA and also furthers the statutory goal of making the victims whole again. Accordingly, today we join the view of the Third, Eighth, and Tenth Circuits and hold that the offset value is the eventual proceeds recouped following a foreclosure sale.

### B. Inclusion of Other Expenditures

In addition to challenging the district court's use of the eventual resale price of the foreclosed real estate as the offset value, Robers also argues on appeal that the district court erred in including various other expenditures in the restitution award related to the Grant Street real estate. The Inlet Shores restitution award was based solely on the difference between loan amount and the resale amount, so there is no additional issue there. But with the Grant Street real estate, the restitution awarded was based on the following figures:

Claim:

| | |
|---|---|
| Unpaid Principal balance | $140,478.91 |
| Accrued interest | $ 13,698.36 |
| Attorney fees | $ 1,400.00 |
| Property taxes | $2,478.10 |
| Other expenses | $450.00 |
| Hazard Insurance | $485.00 |
| Property preservation | $736.54 |
| Statutory Disbursement | $1,311.56 |
| Less ending escrow balance | ($1,823.56) |
| **Total Claim paid:** | **$159,214.91** |

Additional expenses after MGIC took over ownership:

| | |
|---|---|
| Insurance | $374.51 |
| Utilities | $112.69 |
| Title Commitment | $325.00 |
| Broker price opinion | $119.00 |
| Claim investigation costs | $715.00 |
| **Total Expenses:** | **$1,646.20** |

| | |
|---|---|
| **Recovery from sale:** | |
| Sales Price | $118,000.00 |
| Broker's commission | ($8,080.00) |
| Prorated taxes | ($1,724.68) |
| Title Policy | ($607.00) |
| Settlement charges | ($679.39) |
| **Net Proceeds** | **$107,908.93** |
| **Total Loss** | **$52,952.18** |

In challenging these line-item expenses, Robers merely argues that the district court did not adequately explain how or why they should be included. And then he stresses that consequential and incidental expenses are not recoverable. The only specific line-item expenses, though, for which he develops an argument are "attorney's fees" and "other expenses." This court has held that attorney's fees expended in pursuing litigation are not recoverable, *Shepard*, 269 F.3d at 887, but they are recoverable if they represent damage to the property or are incurred as part of an investigation for the prosecution. *Scott*, 405 F.3d at 620. Because we lack sufficient detail to know on which line these attorney's fees fall, we vacate that portion of the restitution award. Similarly, because we cannot know what "other expenses" means and thus whether they are recoverable, we vacate that portion of the restitution award as well.

We reject, however, Robers's claim that the district court did not adequately explain why it included the other miscellaneous expenditures in the restitution award. After stating that it had read the parties' restitution memoranda and the defense's objections, the district court explained:

> The trend is, I think—and the thrust of Seventh Circuit case law, and the thread that runs is becoming stronger in this fabric, is that these expenses aren't going to be considered as consequential . . . . As the government has argued, these are fraud cases. It was a fraud that was perpetrated, which resulted in all of these actions that had to be taken but for

the fraud. And that's not putting a person, a victim in this type of case, in a better place. It's putting a victim back where the victim never should have gone and never would have been but for the conduct that was conducted by the defendant. . . . And I deem it to be the case in this case, as I deemed it to be in the Bradley Hollister case. . . . so consistent with the logic of it, I think that the logic is overwhelming, that the fraud was committed. The victim is owed, and he's owed the direct expenses—I'll call them direct expenses that flow from the fraud that would not have existed or not there—never would have been there.

Robers believes that this discussion is insufficient, citing *United States* v. *Hosking*, 567 F.3d 329 (7th Cir. 2009), wherein the government presented only a single document with general and vague descriptions of the victim's costs. *Id.* at 333. But the problem in *Hosking* was that the district court found that the costs were not appropriately included in restitution order and then, rather than determine the appropriate amount of restitution, merely cut the claimed costs in half. *Id.* at 334. Conversely, here the only component of the award that is unclear is the "other expenses" category, which we have vacated. And we reject Robers's argument that the remainder of the restitution order was not sufficiently explained.

As noted, other than his challenge to "attorney's fees" and "other expenses," Robers does not challenge individually the other line-item expenses, merely stating that they are all consequential or incidental expenses that cannot be recovered. We have held that con-

sequential or incidental expenses are not compensable under the MVRA. *Shepard*, 269 F.3d at 887 ("Both § 3663A and its predecessor § 3663 have been understood to require restitution only for direct losses and not for consequential damages and the other effects that may ripple through the economy."); *United States v. Arvanitis*, 902 F.2d 489, 497 (7th Cir. 1990) ("In the case of restitution for offenses resulting in the loss of property, 18 U.S.C. § 3663(b) limits recovery to property which is the subject of the offense, thereby making restitution for consequential damages, such as attorneys fees, unavailable."). But we have also explained that the "direct" versus "consequential and incidental" demarcation is not exactly helpful. *United States v. Scott*, 405 F.3d 615, 620 (7th Cir. 2005). Rather, the better question is whether the injury is to "property," which is recoverable under the MVRA, or other losses, which are not. *Id.* 619-20.

   In *Scott*, we explained this principle, while holding that an order of restitution appropriately included the cost of an audit:

   The audit expense, though a loss to Scott's employers, was not a gain to him. But it was a form of damage to the [victim-] employers' property. Suppose money was stolen from a bank and eventually returned, but the bank incurred a bookkeeping cost in determining whether the entire amount stolen had been returned. That cost would be a diminution in the value of the bank's property, caused by the theft, and would therefore be a proper item for restitution. See *United States v. Donaby*, 349 F.3d 1046, 1051-54 (7th Cir.

2003); *United States v. Rhodes,* 330 F.3d 949, 953-54 (7th Cir. 2003); *United States v. Hayward,* 359 F.3d 631, 642 (3d Cir. 2004). This case is no different.

*Id.* at 619.

Like *Scott,* we conclude in this case that the remainder of the line-item expenses fall on the injury-to-property side of the line. The property damaged by Robers's fraud was capital and to recoup that capital, Fannie Mae and then MGIC had to incur numerous expenses to safeguard, keep up, and dispose of the collateral that secured the loan. The only way MGIC was able to regain its capital at the end of the day, at the value it recovered on resale, was by expending cash up front. For instance, if real estate taxes were not current, the buyer's offer would be lower by an equal amount. If title insurance were not provided, the purchase would be riskier and the buyer would be only willing to purchase at a lower price. If a realtor were not hired, the property would not be marketed as effectively, again leading to a lower amount. And maintenance and utilities expenses preserved the collateral, and insurance safeguarded the collateral while the victim attempted to mitigate the damage to its property. In other words, the amounts expended by the victim to achieve the final disposition of the collateral real estate were incurred solely to rectify, to the extent possible, the damage to the capital. These expenses are directly related to Robers's fraud

and are thus recoverable.[14] Accordingly, we affirm the restitution award, other than the award for attorney's fees and "other expenses," which we vacate, and we remand for entry of judgment consistent with this opinion.

### III. Conclusion

Robers's fraud deprived his victims of cash. Under the MVRA, restitution of the property stolen—here cash—was mandatory. Because cash was stolen and cash was not returned to the victims until the collateral securing the fraudulent loans was sold, under the plain language of the MVRA the value of the property returned on the date of its return is the amount of cash recovered at

---

[14] The Eighth Circuit in *United States v. Alexander*, 679 F.3d 721 (8th Cir. 2012), upheld a restitution award to HUD that included foreclosure expenses. The court in *Alexander*, though, held that foreclosure expenses were recoverable under the MVRA because HUD was a victim of the crime and "was responsible for making such a payment to the lender based on its guarantee of the mortgage loan." *Id.* However, in the case before us, the government seeks restitution to MGIC, not as a victim, but because it is subrogated to the lender's interest pursuant to 18 U.S.C. § 3664(j)(1). Being subrogated to Fannie Mae's interest, then, means that MGIC steps into the shoes of Fannie Mae and cannot recover merely because it paid Fannie Mae's insurance claim. *See Shepard*, 269 F.3d at 887. Thus, *Alexander*'s analysis is inapplicable and, as we have done above, we have focused instead on the restitution due to MGIC not as an insurer, but as if it were the lender.

the time the foreclosed real estate was eventually resold. In a stagnant, declining market, house values will decrease and this reduction in value of the real estate is a risk that falls on Robers, the one who defrauded the victims. The loss in value of the real estate and the various line-item expenses incurred by the victims while attempting to convert the collateral back to cash are directly caused by Robers's fraud and constitute recoverable damages to his property. Attorney's fees for collecting a debt, though, are not properly recoverable under the MVRA and "other expenses" may not be. Accordingly, we vacate that portion of the restitution award. For these reasons, we AFFIRM IN PART, VACATE IN PART, and REMAND to the district court for entry of a restitution order consistent with this opinion.